[No. 46491. En Banc. October 23, 1980.]

*In the Matter of the Personal Restraint of*
JOHN G. HAVERTY, *Petitioner.*

*Gene M. Grantham,* for petitioner.

*Slade Gorton, Attorney General,* and *Nate D. Manna-kee, Assistant,* for respondent.

HOROWITZ, J.—This case concerns a personal restraint petition alleging that petitioner's administrative parole revocation prior to this court's decision in *In re Akridge,* 90 Wn.2d 350, 581 P.2d 1050 (1978), violated his due process rights.

In 1977, while on parole from a prior conviction, petitioner John Haverty was found guilty of second degree burglary and adjudged to be a habitual criminal. He was sentenced to life imprisonment. On January 25, 1978, Haverty's parole was administratively revoked pursuant to RCW 9.95.120.

RCW 9.95.120, the relevant portion of which was enacted in 1961, provided for revocation of parole without a hearing when the basis for revocation was commission and conviction of a new felony. *In re Akridge, supra,* which was decided August 3, 1978, declared that the parolee's constitutional rights to due process prevented this type of administrative parole revocation and required the State to give the parolee "an opportunity to explain why a subsequent conviction should not result in parole revocation." *In re Akridge, supra* at 353 (applying *Morrissey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). The Ninth Circuit likewise on September 1, 1978, concluded that RCW 9.95.120's provisions for administrative parole revocation were unconstitutional in *Heinz v. McNutt,* 582 F.2d 1190 (9th Cir. 1978).

The State does not contend that the procedure through which Haverty's parole was revoked would be adequate under *Akridge.* But Haverty's administrative parole revocation took place over 6 months before this court's decision in *Akridge.* Thus, only if *Akridge* is to be applied retroactively or if *Morrissey* alone would invalidate the procedure were petitioner's due process rights violated.

We hold that petitioner's constitutional rights were violated and therefore grant his petition for a parole revocation hearing before the Board of Prison Terms and Paroles for the reasons stated below.

## I
### APPLICATION OF *MORRISSEY V. BREWER*

*Morrissey v. Brewer, supra,* concerned the parolee's due process rights to a hearing before being incarcerated for violation of a condition of parole. *Morrissey* held:

> There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority. This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an

opportunity to be heard and to show, if he can, that he did not violate the conditions, [apparently not applicable in the case of a conviction] or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.

*Morrissey v. Brewer, supra* at 487–88 (quoted with bracketed phrase in *In re Akridge, supra* at 352–53).

In *Akridge,* this court held that *Morrissey* and the due process hearing requirement it set forth prevented the State from administratively revoking the parole of a newly convicted felon pursuant to RCW 9.95.120:

Our narrow holding is that *Morrissey* requires that the parolee have an opportunity to explain why a subsequent conviction should not result in parole revocation. The *Morrissey* requirements grafted on our statutory scheme mandate that this "opportunity to explain" occurs before the body vested with parole revocation authority—the board.

*In re Akridge, supra* at 353. In this case, Haverty was not given the "opportunity to explain" "clearly mandated" by *Morrissey. In re Akridge, supra* at 352.

This direct application of *Morrissey* alone requires us to grant Haverty's personal restraint petition. *Akridge* itself relied only on the constitutional holding of *Morrissey* in invalidating RCW 9.95.120. *Morrissey* set forth a constitutional right to hearings as a matter of due process that cannot depend on the belated realization of that right in *Akridge.* However, as next appears, even if *Morrissey* did not compel our decision today the same result would be reached by retroactive application of the rule of *In re Akridge.*

## II
### Retroactive Application of *In re Akridge*

■ *Akridge* itself does not discuss whether the rule it sets forth is to be applied retroactively. In determining whether to apply a criminal procedure decision retroactively, courts have generally considered three questions:

1. What purpose is to be served by the new rule? Will retroactive application of the rule effectively serve that purpose?

2. To what extent has the governmental entity justifiably relied on the preexisting rule?

3. What effect would retroactive application have on the administration of justice? *Linkletter v. Walker,* 381 U.S. 618, 14 L. Ed. 2d 601, 85 S. Ct. 1731 (1965); *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *Wood v. Morris,* 87 Wn.2d 501, 554 P.2d 1032 (1976); *Brumley v. Charles R. Denney Juvenile Center,* 77 Wn.2d 702, 466 P.2d 481 (1970); *State v. Durham,* 16 Wn. App. 648, 559 P.2d 567 (1977).

## A

### PURPOSE OF THE RULE

■ Constitutional holdings relating to the fact–finding process and its integrity and reliability are generally given retroactive application. On the other hand, those decisions limiting the government's ability to obtain and use otherwise probative evidence against the defendant as a rule apply prospectively only. *McConnell v. Rhay,* 393 U.S. 2, 21 L. Ed. 2d 2, 89 S. Ct. 32 (1968); *Yellowwolf v. Morris,* 536 F.2d 813 (9th Cir. 1976); 43 Fordham L. Rev. 1060 (1975); 21 Syracuse L. Rev. 993 (1970).

The State first argues that the fact–finding process is not affected by the requirement of a prerevocation mitigation hearing. It contends that since the defendant was convicted in a criminal prosecution in which he was afforded his procedural rights, there is no question as to the grounds for revocation.

However, *Akridge* was concerned with the parolee's opportunity to present *mitigating* factors that might prevent revocation. *In re Akridge, supra* at 353; *see also Morrissey v. Brewer, supra* at 480, 484. The integrity of the *revocation* fact–finding process, the method through which the decision to revoke is made, is obviously affected by failure to consider in a mitigation hearing those factors

given constitutional significance by *Morrissey*. As noted by the federal court in *Heinz v. McNutt, supra* at page 1194, "[p]arole revocation considerations may differ from those involved in the sentencing for a criminal conviction."

The hearing required by *Akridge* satisfies the parolee's liberty and society's rehabilitative interests by insuring that the decision to revoke is made on an adequate factual basis. This is the type of purpose traditionally afforded retroactive application. *See Linkletter v. Walker, supra* (requirement of hearing on voluntariness of confession made retroactive).

The State next argues that the retroactive application of *Akridge* will not effectively further protect the integrity of the fact–finding process because as a practical matter the prisoner has already had an opportunity to present mitigating circumstances during the hearing at which his minimum term was set.[1] This hearing did not, however, insure the procedural integrity of the revocation decision *itself.* The minimum sentence hearing is not expressly provided for by statute, but is an informal procedure held pursuant to RCW 9.95.040, .170. It is generally held at the site of imprisonment; there is no authority for the prisoner to call witnesses and he is not represented by counsel. A parole revocation hearing, on the other hand, is held near the site of the parole violation. RCW 9.95.120. The parolee may be represented by counsel, RCW 9.95.122, and may call witnesses. RCW 9.95.123. The parolee must be given a written statement of the violations of parole allegedly committed prior to the revocation hearing. RCW 9.95.121.

---

[1]RCW 9.95.170 provides:
> [I]t shall not only be the duty of the board . . . to thoroughly inform itself as to the facts of such convicted person's crime but also to inform itself as thoroughly as possible as to such convict as a personality.

Consideration of the "convict as a personality," would, presumably, under the State's analysis include examination of the mitigating factors given significance for revocation purposes by *Morrissey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).

It is true that the damage sought to be rectified by *Akridge*—unwarranted revocation and loss of liberty—has already been done. But this error can be rectified by fulfilling the prisoner's due process right to a hearing undertaken with sufficient regard to those factors given constitutional significance by *Morrissey*. *Akridge*'s purpose of preserving the integrity of the revocation process is one often given retroactive application.

## B
### RELIANCE ON PREEXISTING RULE

The State argues that in administratively revoking paroles it relied on the continuing validity of RCW 9.95.120 after *Morrissey*. In support of this proposition, the State cites this court's order denying a prisoner's writ of habeas corpus in Heinz v. Morris, cause No. 44046 (February 13, 1976).

In Heinz, the order signed by the Acting Chief Justice stated:

> By administratively revoking the petitioner's parole without a hearing following petitioner's commitment to an adult correctional institution based upon a new felony conviction the Board of Prison Terms and Paroles has complied both with applicable statutory and constitutional directives.

*In re Akridge,* 90 Wn.2d 350, 581 P.2d 1050 (1978), of course, rejected that interpretation of administrative parole revocation. As will be seen below, Heinz does not have precedential value sufficient to justify the State's reliance on RCW 9.95.120 prior to *Akridge*.

This court is obliged to state the grounds for its decision, *State v. Mitchell,* 55 Wash. 513, 515, 104 P. 791 (1909); the order in Heinz cited no precedent and provided no analysis for its conclusion. The federal courts have afforded little precedential value to summary affirmance without an opinion of suits within the court's obligatory jurisdiction. *Dillenburg v. Kramer,* 469 F.2d 1222, 1225 (9th Cir. 1972). We have in the past not felt bound by inferential holdings set forth without discussion of their grounds,

as in the order at issue here. *Petley v. Tacoma,* 127 Wash. 459, 467–68, 221 P. 579 (1923).

In addition, as a policy matter we believe that allowing state agencies to rely on unpublished orders in the face of subsequent fully reasoned opinions to the contrary too severely penalizes the individual plaintiff who could have no notice of the earlier ruling. Allowing such reliance would not adequately encourage independent agency reassessment of state policies placed in doubt by constitutional criminal procedure decisions.

*Akridge* neither overruled existing case law with true precedential value nor was unexpectable after *Morrissey.* The State may have felt that Heinz gave it private assurance that continued use of RCW 9.95.120 was constitutional, but its reliance could not be thought to have been justified by precedent or by a careful reading of *Morrissey* itself.[2]

## C
### EFFECT ON ADMINISTRATION OF JUSTICE

The State finally contends that if *Akridge* were applied retroactively to the date of *Morrissey* the state's prison and parole system would be unduly burdened. The State has submitted several affidavits concerning the possible impact of retroactivity on the administration of justice. The State first asserted that 2,150 additional mitigation hearings would be necessary to accommodate prisoners whose paroles were administratively revoked between 1972 and 1978; a better–documented later projection by the State showed that 152 individuals would be entitled to mitigation hearings if the principles announced in *Akridge* were applied beginning July 1, 1975. The importance of mitigation hearings for individuals whose paroles were revoked

---

[2]*Morrissey* itself has not been given retroactive application. *Wolff v. McDonnell,* 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). However, *Morrissey* was a clear, unprecedented break with past law. This alone could distinguish it from *Akridge,* which was clearly foreshadowed by *Morrissey. See In re Akridge,* 90 Wn.2d 350, 353, 581 P.2d 1050 (1978).

earlier than that date is in doubt, because the median prison stay for parole violators is only about 1 year. The administrative process of identifying those prisoners entitled to a mitigation hearing must also be considered in assessing the burden which would be placed on the State by retroactive application of *Akridge.*

█ It is true that the courts have given "great weight" to administrative efficiency in determining whether to give retroactive application to procedural improvements not part of the criminal trial itself:

> [G]reat weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons . . ., and the reliance prison officials placed, in good faith, on prior law not requiring such procedures.

*Wolff v. McDonnell,* 418 U.S. 539, 574, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974); *Gardner v. McCarthy,* 503 F.2d 733 (9th Cir. 1974). As noted in *Wolff,* however, the administrative burden in this case must be considered in light of the justifications for the State's continued reliance on RCW 9.95-.120. As we have demonstrated above, that reliance was not justified after *Morrissey.*

The State's assertion that retroactivity will unduly burden the State is unchallenged, but it is also unsupported by independent evidence. Even those projections provided by the State vary widely. We cannot prevent retroactive application of *Akridge* on the basis of the State's speculative assertion that such a ruling will unduly burden its agencies.

The petitioner's constitutional rights have been violated. Under the holding of *Morrissey v. Brewer, supra,* Haverty was entitled to a mitigation hearing before his parole was revoked. Even if *Morrissey* did not compel this conclusion, retroactive application of *In re Akridge* to the date of *Morrissey* would require us to direct that Haverty be allowed a mitigation hearing. The mitigation hearing affects the integrity of the revocation fact–finding process, the State's reliance on RCW 9.95.120 was unjustified after the Supreme Court's decision in *Morrissey,* and there has not been a sufficient showing that retroactive application of

*Akridge* would adversely affect the administration of justice in the state's prison and parole system. We therefore must direct the Board of Prison Terms and Paroles to afford Haverty a parole revocation hearing and to reinstate petitioner's parole should it find that revocation of his parole was unjustified.

It is so ordered.

UTTER, C.J., and STAFFORD, BRACHTENBACH, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

WRIGHT, J. (concurring)—The majority is absolutely correct in saying this is a constitutional right which has existed from the adoption of the Fourteenth Amendment, which was 1868.

When we determine that a party, such as the petitioner herein, has a constitutional right, we necessarily imply that all who are situated similarly to the petitioner also have the same constitutional right, and have had it since the adoption of the relevant constitutional provision. Thus, it is incorrect to fail to apply a constitutional right retroactively. However, when common law rights are in question and we abrogate a judge–made rule, it is obviously proper, and often desirable, to apply the new rule prospectively.

There is much practical merit to the view of the dissent, and were the right involved other than a right granted by the constitution, the situation would be different.

Given the posture of this case, I feel it my duty to support and uphold the constitution and sign the majority opinion.

ROSELLINI, J. (dissenting)—The decision of the majority in this case today places a heavy and useless burden on prison officials. Far from being required by *Morrissey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972), it is contrary to the principle implicitly applied in that case (and expressly applied in *Wolff v. McDonnell,* 418

U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974)) that constitutional interpretations embodying new procedural requirements should be applied prospectively only, where to make them retroactive would unduly burden the administration of the criminal law system. In *Wolff,* the Supreme Court said:

> The question of retroactivity of new procedural rules affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* that the due process requirements there announced were to be "applicable to *future* revocations of parole," 408 U. S., at 490 (emphasis supplied). Despite the fact that procedures are related to the integrity of the factfinding process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures. During 1973, the Federal Government alone conducted 19,000 misconduct hearings, as compared with 1,173 parole revocation hearings, and 2,023 probation revocation hearings. If *Morrissey–Scarpelli* [*Gagnon v. Scarpelli,* 411 U.S. 778, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973)] rules are not retroactive out of consideration for the burden of federal and state officials, this case is *a fortiori.* We also note that a contrary holding would be very troublesome for the parole system since performance in prison is often a relevant criterion for parole. On the whole, we do not think that error was so pervasive in the system under the old procedures as to warrant this cost or result.

*Wolff,* at 573–74.

It is significant that the court in *Morrissey* did not automatically order a hearing for the petitioners in that case but rather remanded the case with directions that the district court make findings on the procedures actually followed. The court said that if it should be determined that the petitioners had admitted to the parole board authorities that they had committed parole violations, and if those violations were "found [by the court] to be reasonable

grounds for revoking parole under state standards, that would end the matter." *Morrissey,* at 490.

It seems clear to me that these words of the United States Supreme Court upon the very subject now before us, show the proper disposition to be made of this case, and all others where parole revocations occurred before our decision in *In re Akridge,* 90 Wn.2d 350, 581 P.2d 1050 (1978), was published.

If the fact of a violation has been established, as by a conviction in a court of justice, and the court can say that such a violation affords reasonable grounds for revoking parole, the substance of due process has been afforded. It seems hardly open to quibble that conviction of a new crime gives reasonable ground to believe that the individual will be likely to commit further crimes if left at large. If he cannot abide by the law in order to maintain his parole in the first place, it is hardly to be predicted that he will be apt to abide by the conditions of his parole in the future. There may be an exceptional case, but the probability of it hardly warrants the kind of burden the majority places on prison authorities here.

Furthermore, as the United States Supreme Court aptly observed in *Wolff,* to allow hearings upon a matter which has occurred long before would be very troublesome for the parole system, since performance in prison is a relevant criterion for parole. I take this to mean that once parole has been revoked and time has passed, prison officials should not be expected to make subsequent parole decisions on the basis of past conduct alone, but should be able to consider the conduct of the individual after his return to prison.

I also disagree with the majority's conclusion that prison officials had no right to rely on a ruling of the Acting Chief Justice of this court, issued upon a habeas corpus proceeding, where no contrary judicial opinion existed. It must be pointed out that the parole violations involved in *Morrissey* had not resulted in criminal convictions. For aught that appears in the opinion, no charges had been filed against the petitioners. While the case does stress the importance

of the exercise of parole board discretion in deciding whether the proven acts of the parolee are serious enough to warrant revocation, it does not consider and offers no opinion upon the question whether that decision can be made by the legislature itself, instead of delegating it to the parole board. In other words, can the legislature establish a conclusive presumption that a conviction of a crime warrants revocation? It seems to me most likely that the Supreme Court would answer that question in the affirmative, the reasonableness of the presumption being hardly open to serious question. To say the least, the proposition is arguable.

RCW 9.95.120 reflects a legislative finding that conviction of a crime while on parole does indeed warrant revocation, and since this is not a patently unreasonable finding and it was not on its face contrary to the Supreme Court's holding in *Morrissey,* the prison officials were justified relying upon it until its validity was successfully challenged.

It is obvious that the question whether this statutory provision was constitutional was still open when *Akridge* came before this court. The majority places too great a burden upon the administrators of the prison system when they expect them to make their own decisions as to the constitutionality of statutes which have not been reviewed in court. They tell us that governmental officials may not rely upon the written law. To me this is an insidious doctrine, not at all conducive to the orderly conduct of governmental affairs.

I would hold that the decision in *In re Akridge,* 90 Wn.2d 350, 581 P.2d 1050 (1978), like that in *Morrissey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972), applies prospectively only, and would deny the petition.